SCHOOL OF APPLIED ART *v.* BUCKLEY.

1. RELEASE — CORPORATIONS — MISAPPROPRIATION OF FUNDS — OF-
   FICIAL ACT.

   Where there was dissatisfaction with defendant's manage-
   ment of the affairs of a corporation of which he was secre-
   tary, treasurer, and manager, and a tripartite agreement
   was signed by the parties in interest settling their affairs
   and releasing defendant, who was withdrawing from the
   business, from all claims of every nature against him on
   account of any official acts, misappropriation of funds
   which he had paid to himself as salary in addition to his
   fixed salary, not disclosed to complainant at the time the
   release was signed, although an examination of the books
   would have disclosed it, was not an official act included
   in the release.

2. SAME—FRAUDULENT ISSUE OF STOCK.

   But the fraudulent issue of corporate stock by defendant,
   who appropriated the proceeds to his own use, was an
   official act from the liability for which the agreement
   released him.

Appeal from Calhoun; North, J. Submitted June
28, 1915. (Docket No. 19.) Decided September 28,
1915.

Bill by the School of Applied Art, a corporation,
against Claude W. Buckley for an accounting and for
other relief. From a decree for defendant, complain-
ant appeals. Reversed and decree entered in this
court.

*Burritt Hamilton* and *Stewart & Jacobs,* for com-
plainant.

*John W. Bailey* and *Howard W. Cavanagh,* for de-
fendant.

OSTRANDER, J.   Complainant corporation seeks in this suit an accounting with defendant, who was for more than five years a director, secretary, treasurer, and manager of the corporation, from November 4, 1905, to March 1, 1911.   It is said in defendant's brief that he did all of the work, from licking stamps to managing the business.   The books, except as kept by defendant, were kept by inexperienced girls, receiving $5 or $6 a week.   In April, 1911, an accountant was employed by complainant, and after spending some time preparing forms for a new system of bookkeeping began the collection of data for opening the new set of books.   It is charged that he found irregularities in defendant's conduct of the business, and they are made the subject of this suit.   A hearing, which we are told lasted three weeks, was concluded by a decree dismissing the bill of complaint.

The settled case, certified to contain the substance of "all the evidence in this cause," makes a printed record of nearly 1,100 pages, and counsel for defendant say, in the brief, that matter which it was understood and promised the trial judge should be incorporated is not contained therein.   An omitted exhibit and the opinion delivered by the trial judge are printed in defendant's brief.   Counsel for defendant have bitterly attacked one of the counsel for complainant, and this has led to reply.   So far as the items of complainant's demand which are urged here are concerned, we discover in the record no evidence of any conduct of complainant's counsel which excuses defendant, or which can be characterized as reprehensible or unprofessional.   The opinion of the trial court contains no analysis of the testimony, and no specific findings of fact based upon the testimony, for the reason, we assume, that in the opinion of the court the complainant, through its officers, is chargeable with notice of most of the matters now complained about, and acted after

notice, or after being chargeable with notice, in a manner to waive the right to pursue defendant with respect to them, or, by a certain release, expressly waived such right.

We think it apparent, both from the opinion of the court and from the decree entered, that an application was made of the doctrine of estoppel, and a construction given to a written instrument, which cannot be sustained. We shall assume that the trial court would have found the facts to be as we find them to be, since most of them are sustained by defendant's testimony. The specifications of complainant's demand which are most relied upon, and to which we shall give attention are:

"(1) $1,646.88 for capital stock of the par value of $2,256 which the defendant converted and sold for his own use.

"(2) $30, cash which the defendant took from the company in connection with this stock transaction.

"(3) $38.50, cash taken by the defendant as interest, likewise forming a part of the above stock transaction.

"(4) $181, cash taken by the defendant in payment of overtime which he claims to have put in for complainant company.

"(5) $857.35, cash taken by the defendant as salary (not including overtime charges) over and above the amount to which he was entitled."

A brief history of the corporation must be given. In giving it, we state what we find from the record to be the facts. It was incorporated November 4, 1905, with an authorized capital of $3,500, 350 shares of stock, at $10 each. On November 15, 1905, the total capital stock was issued in 5 certificates, certificate No. 1 to defendant for 86 shares, certificate No. 2 to defendant for 163 shares, certificate No. 3 to Cora O. Pilsworth for 99 shares, certificate No. 4 to Edward S. Pilsworth for 1 share, certificate No. 5 to Queen H. Buckley for 1 share. Meetings of directors and of

stockholders were infrequently held. There had been a pre-existing organization of the same name, the property of which was acquired by defendant through foreclosure of a chattel mortgage, who transferred it to complainant in payment for stock. The plan was to give Mr. Pilsworth (president) and wife 100 shares of stock, and defendant and his wife 100 shares. Of the remaining 150 shares, defendant was to have sufficient, at par, to pay him for his investment. The sum was computed at $644.30, and he received 64 shares. This gave him, in all, 164 shares, 1 of which he gave his wife, retaining 163. It left 86 shares, which were issued to defendant, and by him transferred to the corporation, to be sold as treasury stock. He was authorized to sell it at $5 per share, and some was sold at this price.

Under date April 10, 1907, defendant entered upon the books a charge in his favor of $430, which he says was for this 86 shares of stock at $5 a share, and issued to himself, the president also signing the certificate, 40 shares, of the par value of $400. In November, 1908, he entered a charge in his favor of $35.50, as interest on this $430. The odd $30 he drew out in cash. As the entries were made, defendant charged the stock against his labor account. This entry was erased, or crossed off, and it was charged against his cash account. It was upon the trial that he accounted for the transaction as a payment for 86 shares of stock, which he contends was his own, but transferred to the company for its convenience. In December, 1910, the capital stock was increased from $3,500 to $50,000, all of which was issued, and a bond issue of $25,000 was authorized.

Defendant had a fixed weekly salary. He paid himself $181 for overtime. No corporate action sanctioned it. The fact was actually discovered after defendant had retired from the company. Defendant

paid himself salary in excess of the amount fixed and agreed upon. The overcharge is $857.35. The fact is not disputed. It was discovered after he retired from the company.

There was friction and dissatisfaction with defendant's management of affairs. An agreement, reduced to writing, was made February 27, 1911, between defendant, George W. Buckley, his father, and Minnie M. Buckley, parties of the first part, Burritt Hamilton, who was a director of complainant and its counsel, party of the second part, and the complainant, party of the third part, one of the purposes of which was the sale and the purchase by others than the complainant of the stock of the parties of the first part for $15,000, of which $10,000 was to be paid in cash and $5,000 in mortgage bonds of the complainant. The agreement was executed. It contained the following provision:

"(c) That, after consummation of said sale of stock, this instrument shall operate as a release and discharge of all claims, if any, of every name, nature, and description whatsoever, however arising, then held by said Claude W. Buckley, against said third party, except claims arising by virtue of his ownership of bonds of said third party, and except such sums as may be found due him upon an accounting for goods, wares, and merchandise sold to said third party by the Buckley Office Outfitting Company; and this instrument shall operate in like manner as a release of all claims, if any, of every name, nature, and description whatsoever, then held by said third party against said Claude W. Buckley on account of any official acts of said Claude W. Buckley as an officer of said school, it being the intent hereof that this instrument shall operate and stand as a mutual acknowledgment of satisfaction and discharge of all such matters."

Under date July 1, 1909, certain contracts called twin service contracts were entered into between complainant and defendant and between complainant and

its president, Edward S. Pilsworth. From the beginning defendant and his family had had a controlling interest in the company. By these agreements it was sought to increase and to make equal the holdings of stock of the president and of defendant, neither to pay for the additional stock in cash but both to earn it by services to be rendered. They and their families owned, practically, the entire stock of the corporation. This agreed upon adjustment was based in part upon the fact that defendant owned the 40 shares of stock which had been wrongfully, and we find fraudulently, issued to him. The agreement, as made and executed, assumed that defendant owned a certain number of shares, including the said 40 shares, and an equal amount was given to Pilsworth, the president, and so far as appears has been since owned and controlled by him. The 40 shares of stock which defendant acquired in the manner hereinbefore described grew, by stock dividends, from $400 par value to $2,256 par value, and defendant, pursuant to the agreement referred to, sold it, with the remainder of his holdings; its proportionate part of the selling price being $1,-646.88.

There is, of course, very much more concerning the dealings of the interested parties and the history of the corporation than has been stated. A considerable portion of the testimony relates to the various complaints about defendant's official and business conduct and the causes of friction between defendant and other interested parties. The reason given for entering upon this subject is that it explains what was intended to be settled by clause (*c*) of the tripartite agreement. We have no occasion to set out the testimony. It is sufficient to say that the agreement, in the light of the testimony, cannot be interpreted so as to include in the release claims for money which the defendant appropriated without authority, without advising his as-

sociates, and without their knowledge. The language employed in subdivision (c) of the tripartite agreement cannot be reasonably interpreted as defendant now seeks to interpret it. Usually a demand of which parties are ignorant is not embraced in a release. It is the general rule that misappropriation of corporate assets by an officer cannot be authorized or ratified. It is true that the method of bookkeeping was unscientific, making mistakes possible, if not probable. But there is no question of mistake in the act of defendant in taking money for overtime while drawing a fixed salary; none in his drawing $800 more than he was entitled to draw. These were not official acts of defendant, but were peculations of which he does not appear to have been even suspected. The fact that the sums taken were charged to him, and that the other interested parties might have caused an examination of the books to be made before entering into the tripartite agreement, do not aid defendant. He cannot complain because the other contracting parties assumed that he had been honest in the matter of drawing his salary. There was no adversary proceeding, but a mutual settlement, in which, in fact, the honesty of defendant's private account was assumed by all the others; its dishonesty known to himself.

It appears, then, that while he had access to the complainant's funds defendant wrongfully appropriated $938.35 which belonged to the corporation. He settled with and withdrew from the corporation without disclosing this fact. It was later discovered by complainant. We find no good reason for denying to complainant a decree for this sum, with interest from March 1, 1911.

Complainant's right to recover the value, and the value of the increment, of the fraudulently issued 40 shares of stock, or to recover what defendant received for it, presents a question of greater difficulty. The

corporation is not seeking to cancel the certificate of stock, but it proceeds upon the theory that the 40 shares of stock—

"remained, in equity, the property of complainant. Their increase by way of stock dividends was also complainant's property. * * * As an agent he is bound to account for this."

The act of issuing stock of a corporation is an official act. As was said by CAMPBELL, C. J., in *Hempfling* v. *Burr,* 59 Mich. 294 (26 N. W. 496) :

"It is quite likely that Burr's conduct may have been official, but we are not aware of any principle which will exempt a person from personal responsibility for fraud committed in a double capacity. It is no part of official duty to commit fraud, and there are probably cases where a corporation may not be liable for the frauds of its officers."

It is the general rule, relied upon by complainant, that an agent is bound to account to his principal for all money and property which may come into his hands by virtue of the agency, and this rule embraces, not only such money and property as may be received directly from the principal, but also that which comes into the agent's hands for the principal as the result of the agency. 1 Mechem on Agency (2d Ed.), § 1327. The manager, secretary, and treasurer of a private corporation is, of course, an agent of the corporation. But an official act of his, although in his own interest, differs in some respects from a mere peculation; for example, a taking of money to which he had access by reason of his agency. Subdivision (*c*) of the tripartite agreement was drawn by a lawyer. The words, "on account of any official acts of said Claude W. Buckley as an officer of said school," must be held to mean something. No particular acts are described or defined. What was the reason for the release, unless it was suspected, or believed, or thought possible, that

defendant had officially performed some act for which he might be personally answerable to the corporation? The corporation did not, in fact, know about the fraudulent issue of the 40 shares of stock; but it did not limit its release other than by use of the general term. From the consequences of proper official conduct no release was required. We feel constrained to deny to complainant any recovery on account of the issue of stock and on account of the details which were a part of the transaction. The unexcused, and inexcusable, laches of officers of the corporation in not knowing for what consideration its stock was issued, while it is not made the ground of decision, made the loss which has occurred possible. This fact may, or may not, help the defrauded complainant to support with some equanimity a conclusion which is rested upon the contract which it made.

The decree is reversed, and a decree may be entered in this court in conformity with this opinion. Appellant will recover costs of this appeal.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.

The late Justice McALVAY took no part in this decision.